

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROXANNE SULLIVAN,<br><br>*Defendant.* | Case No. 3:23CR 138<br><br>18 U.S.C. § 1957<br>Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity<br>(Count 1)<br><br>Forfeiture Allegation |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### General Allegations

At all times material to this Criminal Information, unless otherwise stated:

1. The defendant, ROXANNE SULLIVAN ("SULLIVAN"), was a resident of Beaverdam, Virginia, located within the Eastern District of Virginia.

2. Company 1, a company headquartered in Warrenville, Illinois, is in the business of providing specialized venue transformation services. Company 1 designs, delivers, and installs audience risers, stadium seating, platforms, drapery, and scenery for high-end sporting, corporate, and other special events. Providing these services requires Company 1 employees to travel to event sites located across the United States and stay on-site before, during, and after events. Accordingly, Company 1 books a significant number of hotel rooms, corporate housing, and other forms of lodging each year for its personnel.

3. Company 1 acquired Company 2, a company headquartered in Ashland, Virginia, in or around August of 2016. Company 2 provided the same general services as Company 1, as it rented, delivered, assembled, and dismantled temporary seating, flooring, and camera towers for

large outdoor events in the United States.

4. Company 2 hired the defendant, SULLIVAN, in or around April 2012, to fill the full-time, salaried position of Travel Manager. SULLIVAN's duties consisted of managing hotel bookings and other necessary logistics for Company 2 employee travel. As part of SULLIVAN's negotiated agreement with Company 2, SULLIVAN was permitted to retain travel commissions on any bookings she made: hotel, air, and rental car. SULLIVAN's annual salary was kept a low $45,000 per year because she was retaining her commissions. Company 1 retained SULLIVAN in this same position upon Company 1's acquisition of Company 2 in August of 2016.

5. Prior to becoming an employee at Company 2, SULLIVAN owned and operated a travel agency, Ravens World Travel ("Ravens World"), which SULLIVAN claimed to have operated from December of 1999 until April of 2012. SULLIVAN was also a travel agent with the International Air Transport Association (IATA). As a travel agent, working for clients, SULLIVAN could earn "commissions" on the bookings she completed – that is, a payment remitted to the travel agent by the hotel that consists of a pre-determined portion of the lodging or travel accommodations purchased by the travel agent's client.

6. Because a hotel is required to remit a portion of a booking customer's payment to the travel agent—in effect, reducing the hotel's proceeds for that transaction—a hotel's "commissionable rates" for hotel rooms are often more expensive than "non-commissionable rates," which instead allow the hotel to keep the entirety of the transaction proceeds. In extended stay bulk travel bookings, such as those made by SULLIVAN for Company 1, hotel bookings are frequently negotiated on a case-by-case basis. In some instances, commissionable rates are higher than non-commissionable rates. In some instances, commissionable rates are the same as non-commissionable rates.

7. In her capacity as a travel agent, SULLIVAN utilized the services of a travel advisor

2

agency named Nexion. Among other services, Nexion allows travel agent users to process their hotel and travel booking commissions through Nexion (in effect, hotels and other travel-related businesses will transfer a travel agent's booking commissions to Nexion, which processes the commission and remits the proceeds to the travel agent). Nexion remitted SULLIVAN's commission payments to a bank account SULLIVAN created for Ravens World Travel at BB&T Bank (now Truist Financial), a financial institution as that term is defined at 18 U.S.C. § 20. SULLIVAN also maintained a personal bank account at BB&T Bank (account number ending -6095).

8. When making the decision to retain SULLIVAN as a Company 1 employee when acquiring Company 2, Company 1 did not hire or engage SULLIVAN's Ravens World Travel, or otherwise agree to or intend to enter into a travel agent-client relationship with Ravens World Travel. Rather, Company 1 understood it was retaining SULLIVAN as a full-time, salaried employee, responsible—as the company's in-house Travel Manager—for booking adequate and acceptable travel arrangements and accommodations at the best possible price for her employer.

### The Scheme and Artifice to Defraud

9. From at least in or around August of 2016, and continuing through on or about July 20, 2022, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, the defendant, ROXANNE SULLIVAN, knowingly, unlawfully, and with intent to defraud, executed and attempted to execute a scheme and artifice to defraud her employer, Company 1, and to obtain money, funds, and property belonging to Company 1, by means of materially false and fraudulent pretenses and promises, and for the purpose of executing this scheme, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce certain signals and sounds.

## Purpose of the Scheme and Artifice to Defraud

10. The purpose of the scheme and artifice to defraud was for SULLIVAN to unlawfully enrich herself by arranging for Company 1 to pay higher "commissionable" rates for hotel rooms, rather than the lower, corporate (but non-commissionable) rates that were otherwise available to Company 1, and subsequently directing the commissions—that is, Company 1's over-payments—for these hotel bookings to her Ravens World bank account at BB&T.

## Manner and Means of the Scheme and Artifice to Defraud

11. The manner and means of the scheme and artifice to defraud included, but were not limited to, the following:

    a. In her capacity as Company 1's Travel Manager, SULLIVAN was entrusted with the autonomy to select and purchase hotel accommodations for Company 1's traveling employees. To this end, SULLIVAN would contact hotel chain representatives to solicit and evaluate hotel rates and accommodation offerings.

    b. Those hotel representatives would provide SULLIVAN with the hotel room costs that Company 1 could expect to pay for Company 1's hotel room reservation(s); in some cases, the representative would offer Sullivan non-commissionable (that is, lower-cost) room rates.

    c. Rather than soliciting or accepting the hotel chains' representatives' lowest non-commissionable rate room prices, however, SULLIVAN would instead direct the hotel representatives to provide her with lowest commissionable room rates—that was, at times, a *higher* rate for the same rooms.

    d. As a result of SULLIVAN's deliberate selection of commissionable room rates, SULLIVAN's employer, Company 1, sometimes paid a higher cost for the hotel

   rooms in question than they would have been required to pay had SULLIVAN requested only the lowest non-commissionable room rate.

  e. In instances when the commissionable rate was higher than the non-commissionable rate, the hotel chain would then remit the additional funds (unwittingly) expended by Company 1—that is, SULLIVAN's commission—to SULLIVAN, typically through SULLIVAN's Nexion account for Ravens World Travel. SULLIVAN would subsequently transfer those fraudulently-obtained funds from her Nexion account to her Ravens World bank account at BB&T Bank. SULLIVAN would then use those fraudulently-obtained funds for her own purposes.

### **Execution of the Scheme and Artifice**

12. Between in or around August of 2016, and continuing through on or about July 20, 2022, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, for the purpose of executing and attempting to execute the scheme and artifice to defraud, defendant ROXANNE SULLIVAN caused to be sent and delivered in interstate and foreign commerce via wire communication certain signs, signals, and writings—notably, email communications between SULLIVAN, operating from an office in Ashland, Virginia, and representatives of numerous national hotel chains operating from states and commonwealths other than the Commonwealth of Virginia.

13. At all times, SULLIVAN knew and understood that her commissionable rate scheme resulted in her employer, Company 1, sometimes being charged more for hotel accommodations than was required to secure the room reservations in question. SULLIVAN deliberately directed hotel representatives to provide SULLIVAN with commissionable room rates, knowing and intending that Company 1 could be paying a higher rate—and that Company

1's additional expenditure would be routed not to the hotel chain in question, but to SULLIVAN's own bank account. Representative examples of SULLIVAN's deliberate insistence on the addition of her commission to Company 1's total costs include the following.

| On or About Date | SULLIVAN Correspondence |
|---|---|
| Feb. 6, 2020 | SULLIVAN corresponds with a representative of Sonesta International Hotels Corporation for the purpose of booking hotel rooms for a Company 1 crew in Georgia. After receiving the available rates from the hotel representative, SULLIVAN states that *"I forgot to tell you I am a travel agent and need Commissionable rates."* The hotel representative confirms that the rates can be increased 10 percent to accommodate SULLIVAN's demand for commissions. |
| Dec. 13, 2021 | SULLIVAN corresponds with a representative of My Place Hotels for the purpose of booking hotel rooms for Company 1 employees in Lebanon, Tennessee.<br>- Among other questions, the hotel chain representative asks if this transaction would require a commission.<br>- SULLIVAN responds: "Please add the standard 10% Commission to all rates." |
| April 11, 2022 | SULLIVAN corresponds with a representative of the Midwest Lodging Group (a Hilton subsidiary) for the purpose of booking hotel rooms for a Company 1 crew in Michigan.<br>- The representative explains that the hotel can offer rooms for $109.00 per night.<br>- SULLIVAN responds "Will the $109 rate be Commissionable[?]"<br>- The representative responds "Yes, it can be, what is the commission %? Standard for Hilton is 7%."<br>- SULLIVAN responds, *"I normally get 10%"*<br>- The hotel representative subsequently confirms that the hotel can do "the $109 w/ 10% commission." |

14. SULLIVAN knew and understood that her employer had not authorized her commissionable rate scheme, and that if Company 1 learned of SULLIVAN's scheme to route Company 1 travel budget funds into her own bank account, SULLIVAN's ability to continue to

profit from the scheme would come to a sudden end. Accordingly, SULLIVAN took deliberate steps to conceal her activities from Company 1 management. SULLIVAN's efforts at concealment included, for example:

    a. On or about January 23, 2020, a representative of the Wyndham Hotel Group emailed SULLIVAN a quote for hotel rooms at a "$105 commissionable" rate and another set of rooms at a "$119 commissionable" rate. SULLIVAN, who in this instance needed approval from Company 1 management due to the exigent nature of the travel plans in question, forwarded the Wyndham representative's email to Company 1's Executive Vice President of Operations, but edited that email to remove the word "commissionable" from the representative's quote for $119.

    b. On or about February 18, 2021, SULLIVAN responded to a reservation confirmation email from a representative of Wyndham Hotels. SULLIVAN was irate that the hotel reservation confirmation language directly referenced SULLIVAN's commissions. SULLIVAN wrote to the hotel representative, in all caps, that "I THOUGHT YOU CHANGE[D] THE LANGUAGE ON THESE CONFIRMATIONS I WILL STOP USING WYNDHAM IF THEY CAN'T GET RID OF IT. I CAN'T HAVE IT COST ME MY MONEY."

    c. On or about March 10, 2021, SULLIVAN emailed a representative of Choice Hotels regarding a contract between Company 1 and Choice Hotels. SULLIVAN explained that she had reviewed the draft contract, and requested that a reference to SULLIVAN's commissions be deleted from the contract, "*as commission is not paid to [Company 1].*" When the hotel representative responded that Choice Hotel's legal team was unable to remove the commission line, SULLIVAN instructed the representative to "[g]*o back to them and tell them that they don't want*

*me exposing there* [sic.] *agreement with anyone nor do I want them disclosing my agreement with choice with my customer.*"

15. Company 1 senior management learned of SULLIVAN's commissionable rate scheme in June of 2022 from an individual who had been employed by Company 1—briefly—as a "Travel Assistant," working directly for SULLIVAN. Company 1 management questioned SULLIVAN during a meeting on or about July 20, 2022. During that meeting, SULLIVAN initially denied aspects of her scheme—for example, disputing that she had ever asked hotel representatives to remove references to commissions from Company 1 contracts—before eventually admitting to her actions and conceding that she had in fact directed the removal of commission references in order to conceal the fact of the commissions from Company 1 so that the commissions "don't stop."

16. On August 10, 2023, federal agents visited SULLIVAN at her Beaverdam residence. After introducing themselves and providing their credentials, the agents—a Special Agent with Internal Revenue Service Criminal Investigation and a Special Agent with the Federal Bureau of Investigation—explained to SULLIVAN that they were engaged in an investigation related to her tenure at Company 1. SULLIVAN, without consulting a lawyer, agreed to speak with the agents, and during the ensuing interview, made numerous, knowingly false representations regarding the above-described commission scheme. Those statements were material to the agents' investigation, which was itself a matter within the jurisdiction of the Executive branch of the United States government. SULLIVAN's willful misrepresentations included the following:

    a. SULLIVAN claimed that she had explicitly informed Company 1's former Chief Executive Officer (CEO) (the Company 1 employee who had made the decision to retain SULLIVAN in the position as Travel Manager) about her intent to continue

using her Ravens World Travel company to collect commissions on the reservations SULLIVAN would now be booking for Company 1, and that the former CEO subsequently agreed to SULLIVAN's proposal and understood that Company 1 would be a "client" of SULLIVAN's Ravens World Travel company. In fact, as SULLIVAN well knew, SULLIVAN had not informed Company 1's CEO that she was retaining commissions, and Company 1 had not agreed to become a client of SULLIVAN's Ravens World Travel company.

b. SULLIVAN told the agents that she "never outright asked for commissions from hotels," and instead had left that decision (whether to provide SULLIVAN with a commissionable rate) up to the hotels' discretion. In fact, as SULLIVAN well knew, SULLIVAN routinely and consistently instructed hotel representatives that SULLIVAN would require commissionable rates as a condition of booking accommodations at the hotel.

c. SULLIVAN claimed that during her 10-plus years of employment at both Company 2 and Company 1, SULLIVAN had made a total of "maybe $500,000" in commissions. In fact, as SULLIVAN well knew, SULLIVAN had received more than $1,000,000 in commission payments during her tenure with Company 1 alone.

## COUNT ONE
(Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity)

17. The allegations contained in Paragraphs 1 through 16 are realleged and incorporated as though set forth in full here.

18. On or about July 15, 2020, in the Eastern District of Virginia, the defendant, ROXANNE SULLIVAN, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally

9

derived property of a value greater than $10,000, that is, the deposit of some $74,000 of U.S. currency into SULLIVAN's personal bank account (ending in -6095) at BB&T Bank, such property having been derived from a specified unlawful activity, that is, Wire Fraud, in violation of 18 U.S.C. § 1343.

(In violation of Title 18, United States Code, Section 1957.)

## FORFEITURE

Pursuant to 32.2 of the Federal Rules of Criminal Procedure, the defendant is hereby notified that, upon conviction of Count One of this Criminal Information, the defendant shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).

If any property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(All in accordance with Title 18, United States Code, Section 982(a)(1) and Title 21, United States Code, Section 853(p).)

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _[signature]_
Thomas A. Garnett
Assistant United States Attorney